Filed 7/3/14  In re Richard V. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re RICHARD V. et al., Persons coming Under the Juvenile Court Law.<br><br>_____<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Petitioner and Respondent,<br><br>     v.<br><br>ANTONIO V.,<br><br>     Objector and Appellant. | B251094<br><br>(Los Angeles County<br>Super. Ct. No. CK96380) |

APPEAL from an order of the Superior Court of Los Angeles County.  Patricia Spear, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Objector and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Petitioner and Respondent.

* * * * * *

Appellant Antonio V. (Father) appeals from a jurisdiction order sustaining a dependency petition pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b),[1] that alleged violent altercations between Father and Marisol S. (Mother) endangered the physical safety of their young children, Richard V. and Anthony V. He also appeals from a disposition order that the children be suitably placed.

We affirm. Substantial evidence supported the juvenile court's jurisdiction and disposition orders.

### FACTUAL AND PROCEDURAL BACKGROUND

On October 9, 2012, Father, Mother, four-year-old Richard and three-year-old Anthony came to the attention of the County of Los Angeles Department of Children and Family Services (Department) when a referral reported that Father was physically abusing Mother in the presence of the children. The referral described an incident that had occurred six to 12 months earlier when Mother had bruises on her face and the police were called. Father and Mother separated after that incident but reunited at some point. The referral reported that approximately two weeks earlier, Richard had hit his maternal grandmother (MGM), and then rolled up his fist and told his MGM that this was the way Father hit Mother.

Three days later, the Department interviewed the MGM, who stated that when she saw Mother two weeks earlier she appeared malnourished, quiet, unable to focus and not at all like herself. She said that Father secludes Mother and she had no current contact information for the family. She had never observed any domestic violence between Father and Mother.

The Department located the family on October 17, 2012, and a social worker went to the home. Richard and Anthony opened the door; at first Mother refused to come to the door, and she refused to look up at the social worker when she finally appeared. The Department contacted law enforcement at that point. When officers arrived, Mother

---

[1]     Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

again delayed appearing at the door.  Once she emerged, officers saw that her left eye was bruised.  They asked to enter the home to speak with her; she became teary and her lower lip trembled when she declined to let them enter.  At that point Father arrived and let in the officers and the social worker.

With Father's permission, the social worker interviewed Richard privately.  After stating he understood what it meant to tell the truth, he said he had seen Father hit Mother.  Though he could not remember when the last incident occurred, he stated that Father hit Mother hard, demonstrating by banging the wall.  When asked what happened to Mother's eye, he pretended to be hitting his eye and said he hit her like this; he then pretended to scratch his face, and described how Father scratched Mother's face and pointed to where she had been bleeding.  Richard said there had been other incidents like that, but he could not describe them.  He added that he was not afraid of anyone in his home.  The social worker also spoke with Anthony privately, but he was not yet sufficiently verbal.

Father did not want to be interviewed privately, stating he had nothing to hide.  After the social worker outlined the allegations of violence, Father denied them multiple times.  He said he did not know what happened to Mother's eye, as Mother did not tell him.  When Father was speculating that a child scratched her, Richard entered the room and said he once scratched Mother.  But when the social worker then asked Richard what happened to his Mother's eye this time, Richard punched his eye and head while pointing to Father and saying, "you, you, you, did this to mommy, and this and then like this."  Richard then added Mother's reaction, saying, "and then my mommy had to do this" while throwing himself on the floor, rolling into a ball and covering his head.  Asked for a reaction to Richard's description, Father smirked and said Richard has a "vivid imagination" and must have learned that somewhere else.

Officers checked for prior domestic violence reports and learned law enforcement had responded to two calls in 2010, but no reports were taken or arrests made.  Father recalled that neighbors called law enforcement because the children were crying too loudly.  Mother denied that law enforcement had ever been to the home.

The Department obtained a removal warrant and returned to the home on November 6, 2012. Mother again delayed coming to the door. When she finally appeared, she had a flat affect and denied meeting the social worker previously or having a bruised eye. Mother thought the social worker was joking when she said she had a removal order. Father arrived and explained that Mother had recently told him the bruise had resulted from a pot falling on her face. Mother again denied even having a bruise. Father packed some things for the children and Mother remained at the door, declining to say good-bye to them.

On November 9, 2012, the Department filed a dependency petition alleging under section 300, subdivisions (a) and (b), that Father and Mother had a history of engaging in violent altercations in their children's presence, including a specific incident in October 2012, when Father scratched and struck Mother in the face causing bleeding and bruising, and that such conduct endangered the children's physical health and safety and placed them at risk of harm. At the detention hearing, the juvenile court appointed a guardian ad litem for Mother, finding she lacked the capacity and ability to understand the consequences of the dependency proceedings. It ordered that the children remain detained and permitted the parents to have monitored visitation.

The Department re-interviewed the family for the December 10, 2012 jurisdiction/disposition report. Without prompting, Richard said that Father had pushed Mother against a wall and acted out how the incident occurred. He added that Father and Mother had hit and kicked each other and that Father once threw a chair at Mother that hit her on the leg. He said that Mother was not well and was angry every day. Mother had slapped him and he had become afraid of her; he was not afraid of Father, who had asked Mother not to hit him. Anthony remained too young to make a statement.

Father again denied that Richard's account of the violence was accurate. He said the bruising on Mother's eye was from a pot falling on her and the scratches were from Richard. As for Richard's description of Father and Mother fighting, Father said Richard must have observed him showing Mother yoga positions. He denied that any incident of domestic violence had ever occurred. He believed that Department involvement was the

4

result of the MGM's false report. Father also reported he was participating in a domestic violence class for perpetrators as well as a parenting class. The Department's efforts to interview Mother were unsuccessful. Though Father once brought her in for an interview, she refused to speak and appeared detached and disengaged from reality.

In a telephone call with the Department, the MGM said she knew Father hit Mother so hard she would bleed. She knew that Father once hit Mother with a chair. She said Father was in charge and she knew Mother was sick—unaware of basic things such as how old she was or how old the children were. She thought the problems began when Mother was pregnant with Anthony, and stated that Father had moved the family to a different apartment approximately one year earlier and she did not know where the family was located. A maternal great aunt said Mother told her about an incident of domestic violence approximately one year ago. She said that at about the same time Mother began acting "weirder," losing weight and refusing to interact with people. On a recent occasion when Mother and Father went to visit the children, Mother stayed in the car. During other visits, Mother and Richard would sit next to each other without speaking.

The Department obtained additional information about a November 2010 domestic violence call. Mother reported to law enforcement that her one-year-old son's crying had upset Father, and she positioned herself between the two when Father raised his hand as if to hit the child. After that, Father yelled at her and struck her twice in the face. When the two of them began to pull at a small table it broke, and Father hit Mother's leg with one of the table pieces. The officer observed that Mother had redness and swelling on both her cheek and leg. Though Mother reported this was not the first incident of domestic violence, she declined an emergency protective order.

The Department recommended that the children remain suitably placed, with Father and Mother receiving reunification services and Mother undergoing an evaluation pursuant to section 730.

In March 2013, the Department reported that Father was looking for a separate residence, indicating that Mother was being uncooperative and perhaps suffered from

5

mental health issues. Father conceded that the children had witnessed verbal arguments between Mother and him but continued to deny any domestic violence. Richard reported that he saw Mother cut up Father's letters and scream at Father, though he characterized Father as strong and well and Mother as weak and sick. Richard's visits with Father had been positive, and on March 20, 2013, the juvenile court increased the visits to four times per week.

At the end of April 2013, the children were placed in a different foster home after the boys reported to their maternal great aunt that their caregiver's 12-year-old son had been naked in bed with them and touched Anthony inappropriately.

By the time of the May 23, 2013 jurisdiction hearing, Father was not residing with Mother and was no longer in a relationship with her. He had been attending parenting classes, a domestic violence group and individual counseling. At the jurisdiction hearing, the juvenile court received the Department's prior reports into evidence, and no witnesses testified.[2] The juvenile court sustained the petition as pled, commenting, "it seems to me that if [Richard] was close enough to observe on multiple occasions hitting between the mother and the father and other violence, that it would seem to me that that conduct places the children at substantial risk of harm—physical harm by the parents." It found that Richard and Anthony were persons as described in section 300, subdivisions (a) and (b).

For the August 7, 2013 contested disposition, the Department reported that Father had relocated to another apartment that appeared clean and suitable. Though recognizing that Father had been participating in multiple programs, the Department expressed concern there was no indication in letters from service providers that Father had ever acknowledged his commission of domestic violence, which raised the possibility that he was continuing to deny his actions to those providers. At the hearing, the juvenile court admitted the Department's prior reports into evidence and heard testimony from Maria

---

[2] The juvenile court did not rule on Father's written evidentiary objections to certain statements in the reports.

6

Suarez, Father's domestic violence group counselor and parenting instructor. She stated that Father had completed 36 sessions in his group domestic violence class and 34 parenting classes, missing two for court appearances. She characterized Father as attentive and willing to learn and believed he had learned the meaning of domestic violence and its signs. She thought Father had benefitted by hearing stories from others in the group, as he expressed to her that he had never hit his wife and never will; he claimed he was taking the classes because he and his wife did not communicate well. Suarez had never seen the Department's reports. Father told her he was in dependency court as a result of the MGM's allegations. She was unaware there had been domestic violence between Father and Mother, that law enforcement had responded to domestic violence calls or that their children witnessed domestic violence She stated that one who has committed domestic violence and denies it would not have learned anything from her class and would need to continue in the program before obtaining custody of a child.

The juvenile court commended Father for making progress in his programs, but expressed concern that Father had not fully acknowledged why he was participating in his programs. The juvenile court declared the children dependents of the court and found by clear and convincing evidence that a substantial danger to them existed if they were returned to Father. It ordered that they remain suitably placed and ordered that Father receive reunification services and unmonitored visitation. It directed that Father give his service providers copies of the Department's reports, and specifically advised that Father's counselor should be made aware of Richard's statements concerning the domestic violence incidents. The juvenile court also ordered a number of services for Mother.

Father appealed.

## DISCUSSION

Father contends substantial evidence did not support the juvenile court's jurisdiction finding under section 300, subdivision (a) or the disposition order. We find no merit to his contentions.

7

## I.  Standard of Review.

We review the juvenile court's jurisdiction and disposition orders under the substantial evidence standard.  (*In re E.B.* (2010) 184 Cal.App.4th 568, 574; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.)  According to this standard, it is the juvenile court's role "'to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence.  We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence.  [Citation.]  Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact.'  [Citation.]"  (*In re A.S.* (2011) 202 Cal.App.4th 237, 244.)  Father bears the burden of showing there is no evidence of a sufficiently substantial nature to support the juvenile court's orders.  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

## II.  Substantial Evidence Supported Jurisdiction Under Section 300, Subdivision (a).

Father challenges only the juvenile court's jurisdiction finding under section 300, subdivision (a). He does not challenge jurisdiction under section 300, subdivision (b).  Given that a basis for jurisdiction would exist regardless of the outcome of the appeal, he acknowledges we need not consider his challenge to the sufficiency of the evidence to support the finding under section 300, subdivision (a).  (See, e.g., *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence"].)  Nonetheless, we may exercise our discretion to reach the merits of Father's jurisdictional challenge.  (See *In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

Section 300, subdivision (a) accords the juvenile court jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent."  Though

8

Father argues that Richard's observing incidents of domestic violence was not tantamount to a risk of nonaccidental injury, the court in *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 600 (*Giovanni F.*), reached the opposite conclusion, declaring: "Domestic violence is nonaccidental." There, the petition alleged and the evidence showed Giovanni witnessed several incidents of domestic violence between his parents, the most recent occurring while his father was driving a car and hit and choked his mother to the point of unconsciousness. (*Giovanni F., supra,* 184 Cal.App.4th at pp. 597, 599.) Giovanni's father similarly conceded the evidence was sufficient under section 300, subdivision (b), but argued jurisdiction could not be sustained under section 300, subdivision (a), as he did not abuse Giovanni or harm him nonaccidentally, nor did Giovanni remain at substantial risk of suffering nonaccidental harm. (*Giovanni F., supra,* at p. 598.) The appellate court rejected that argument: "We conclude that the application of section 300, subdivision (a) is appropriate when, through exposure to a parent's domestic violence, a child suffers, or is at substantial risk of suffering, serious physical harm inflicted nonaccidentally by the parent." (*Id.* at pp. 598-599.)

Here, the evidence showed that Richard and Anthony remained at substantial risk of suffering serious physical harm as a result of Father's nonaccidental conduct. As early as November 2010, Mother feared that Father would strike Anthony directly. Instead, Father struck Mother with a closed fist and a table piece in the presence of one-year-old Anthony. Richard had closely and personally observed multiple incidents of domestic violence. He demonstrated how Father punched Mother in the head and pushed her against the wall; he showed where Mother bled and how she cowered on the floor after being hit; and he described an incident where Father threw a chair at Mother that hit her. There was no evidence to suggest that Father's actions were nonaccidental, nor was there evidence to show that the fact the violence occurred in front of the children was nonaccidental. Moreover, though the evidence showed that Father and Mother were living apart by the time of the jurisdiction hearing, Father continued to deny that he had ever been a domestic violence perpetrator. A parent's denial is a relevant factor in determining whether the parent is likely to modify his behavior. (*In re Esmeralda B.*

9

(1992) 11 Cal.App.4th 1036, 1044; see also *In re R.C.* (2012) 210 Cal.App.4th 930, 942 ["'Studies demonstrate that once violence occurs in a relationship, the use of force will reoccur in 63% of these relationships. . . . Even if a batterer moves on to another relationship, he will continue to use physical force as a means of controlling his new partner'"].)  Accordingly, there was substantial evidence to support the juvenile court's conclusion that the children remained at risk within the meaning of section 300, subdivision (a).

### III.    Substantial Evidence Supported the Disposition Order.

Father also maintains the disposition order should be reversed, arguing there was insufficient evidence of a substantial danger to Richard and Anthony if they were returned home.  Again, we disagree.

The juvenile court ordered the children removed from Father's and Mother's custody pursuant to section 361, subdivision (c)(1), which provides that a dependent child may not be taken from the physical custody of the parents unless the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  (See *In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581 [although trial court makes findings by the elevated standard of clear and convincing evidence, substantial evidence test remains the standard of review on appeal].)

"'A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.]  The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child. [Citation.]' [Citation.]" (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.)  "The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-

10

136 (*In re T.V.*).) "The court may consider a parent's past conduct as well as present circumstances. [Citation.]" (*In re N. M.* (2011) 197 Cal.App.4th 159, 170.)

Substantial evidence supported the removal order. Though the juvenile court acknowledged that Father had been attending multiple programs, it expressed concern that his counselor was unaware of Richard's observations as well as the Department's allegations. Given Father's denial of his role in the domestic violence, the juvenile court indicated it could not be assured he had yet addressed the issues that led to his violent behavior or that he had learned anger management. These circumstances were similar to those in *In re T.V., supra,* 217 Cal.App.4th 126, where the child's mother and father had a history of domestic violence, with some incidents witnessed by their child, and the juvenile court removed the child from the father's custody after the most recent incident. Rejecting the father's argument that there was insufficient evidence of a substantial risk of harm, the court explained that in addition to the evidence of violent altercations, some of which the child heard or saw, the father "had not successfully addressed his anger issues even though he had previously participated in domestic violence treatment and therapy. He denied responsibility for the violence, claiming [the mother] was the aggressor and he did not know how she sustained her injuries. Although [the child] had not been physically injured and was otherwise healthy, the court could reasonably find she was at substantial risk of harm as a result of the parents' ongoing domestic violence and there were no reasonable means by which she could be protected without removal. [Citation.]" (*In re T.V., supra,* at pp. 136-137.)

Father cites favorable comments from Suarez in her progress letter and trial testimony as evidence of lack of risk. But this is not a case where, by the time of disposition, Father had already made significant strides in addressing the problems leading to dependency jurisdiction. (Compare *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288-289 [parents had remorse about their use of corporal punishment and had completed a parenting course, and they were working with a private therapist to improve parenting skills who opined "it was totally safe to return the child"].) Rather, when confronted with a hypothetical scenario involving an individual who had committed

11

domestic violence but who told her he had never committed domestic violence, Suarez testified that the individual would not have learned anything in her program. She added that she believed the individual would need to continue in her program before he was able to have custody of a child. In view of Suarez's lack of information, the juvenile court stated it had to take her favorable "recommendations at this point with a grain of salt, because she isn't even aware of what they're saying dad did." (See *In re Heather A.* (1996) 52 Cal.App.4th 183, 193 [issues of credibility are within the juvenile court's province].)

Father's reliance on *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738 (*Blanca P.*) is likewise misplaced. There, the court highlighted the problems surrounding the "confession dilemma" under circumstances where allegations of sexual abuse were not sustained, there was insufficient evidence of abuse and an expert cast doubt on whether such abuse ever occurred, yet the juvenile court terminated reunification services on the basis of the parents' denial of abuse and the vague notions of their failure to "internalize" general parenting skills. (*Blanca P., supra,* 45 Cal.App.4th at pp. 1751-1754.) Here, on the other hand, Father has not challenged jurisdictional findings under section 300, subdivision (b), including that "violent altercations on the part of the father against the mother" placed the children at risk. Against such findings—as well as overwhelming evidence that Father committed domestic violence in front of the children on more than one occasion—his repeated denials are evidence that the children cannot yet safely be returned to him. (*In re Esmeralda B., supra,* 11 Cal.App.4th at p. 1044.)

In sum, evidence that Richard observed multiple incidents of domestic violence Father committed, that Father continued to deny he had ever engaged in any act of domestic violence and that Father's counselor opined one in such denial had not yet learned anything from her programs and would need additional services before a child could be safely returned supported the juvenile court's removal order pursuant to section

12

361, subdivision (c)(1).

## DISPOSITION

The jurisdiction and disposition orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *

FERNS

We concur:

_____, P. J.

BOREN

_____, J.

CHAVEZ

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.